CHEHARDY, Judge.
Plaintiff, Board of Commissioners of the Orleans Levee District (Levee Board), appeals a December 9, 1980 trial court judgment decreeing that plaintiff’s motion for judgment was denied and further declaring the sale of Marina Bonds, Series 1980A invalid, all at the plaintiff’s costs. Interve-nors, The State of Louisiana, Save Our Wetlands, Inc., and Arthur Nead, had opposed the Levee Board’s motion for judgment on various legal grounds.
It is uncontested that on August 20,1980 the Levee Board passed a resolution authorizing the issuance of the aforementioned bonds in the amount of $31,080,000 to provide the funds necessary for the development and construction of a marina to be located on Lake Pontchartrain adjacent to the Orleans Lakefront Airport. The ordinance stated that the interest to be charged on the bonds was to be fixed at a rate, not to exceed 12%, to be set at the time of sale. It was also established that the bonds were to be sold at one time or in blocks from time to time by sealed bids or by negotiation at the discretion of the Levee Board’s president. The ordinance also authorized the Levee Board to obtain bond insurance and to pay the premiums for this insurance from the proceeds of the sale. It is undis *504 puted that the bonds were to be payable from the revenues of the proposed marina together with the proceeds of taxes to the extent they are available after payment of all prior issued bonds also secured by those taxes.
The judgment of the trial court should be affirmed. We find that the reasons for judgment set forth by Judge Plotkin are well stated and parallel our reasons for affirming.
Accordingly, we adopt the trial court’s Reasons for Judgment as our own:
“The Board of Commissioners of the Orleans Levee District, a political subdivision of the State of Louisiana created by the Louisiana Constitution, brings this motion for judgment to establish the validity of Marina Bonds, Series 1980 A, in the principal sum of $31,080,000.00.
“The Board purposes to raise this sum by issuing ‘General Obligation Bonds’, payable out of revenues from the marina and from ad valorem tax proceeds. The entire issue is to be insured guaranteeing AAA bond rating and payment.
“Intervenors, the State of Louisiana, Save Our Wetlands, Inc., and Arthur Nead, oppose the motion for judgment upon numerous legal grounds.
“The Levee Board does have the authority to develop, operate and maintain a marina. In 1970 the Louisiana Legislature enacted R.S. 38:281, entitled ‘Public Works & Improvements’, clearly conferring on the Levee Board the power to construct a marina.
“‘C. The levee boards of this state * * * may perform recreational functions and use therefor any funds made available to them for such purpose. * * * [T]he boards may develop, operate and maintain recreational areas and for such purposes * * * may construct, operate and repair buildings, ramps, marinas and other facilities and equipment common to a recreational area. * * *’ (Emphasis ours).
“This specific authority is conferred by the Legislature upon the Orleans Levee Board in Part XIX R.S. 38:1235.1(C) which states:
‘In the planning, designing, and executing of a project, the board shall have jurisdiction, power, and authority, within the territorial limits of the project, to dedicate to public use and to lay out, construct, embellish, and maintain a system of parks, beaches, tracts of lands, and streets, with the necessary and related or unrelated buildings, and the usual adjuncts to the kind of development contemplated hereunder; to construct and equip and maintain playgrounds, places of amusement, and entertainment, golf links, gymnasiums, swimming pools, bathing beaches, aviation fields, and other like places.’
“The Levee Board claims the authority to issue bonds as stated in Art. VI, Part III, Section 40 of the 1974 Louisiana Constitution:
‘(A) Authorization. Subject to approval by the State Bond Commission or its successor, the governing authority of a levee district may fund the proceeds of its taxes or other revenues into bonds or other evidences of indebtedness. Proceeds thus derived shall be used for the purposes mentioned in Part III of this Article or for the funding or payment of any outstanding indebtedness.
‘(B) Sale. Bonds issued under the authority of Paragraph (A) shall be sold as provided by law concerning the issuance of bonds by levee districts.’
“The above article authorizes the Board to issue bonds without the necessity of any Legislative Act in order to fund its purposes.
“The Board has designed these bonds so that the revenues from the proposed marina will amortize the bonds when they become due. They propose a secondary pledge of the proceeds of the tax provided by Section 39, Article VI, of the Louisiana 1974 Constitution:
‘(A) District Tax; Millage Limit. For the purpose of constructing and maintaining levees, levee drainage, flood pro *505 tection, hurricane flood protection, and for all other purposes incidental thereto, the governing authority of a levee district may levy annually a tax not to exceed five mills, except the Board of Levee Commissioners of the Orleans Levee District which may levy annually a tax not to exceed two and one-half mills, on the dollar of the assessed valuation of all taxable property situated within the alluvial portions of the district subject to overflow.
‘(B) Millage Increase. If the necessity to raise additional funds arises in any levee district for any purpose set forth in Paragraph (A), or for any other purpose related to its authorized powers and functions as specified by law, the tax may be increased. However, the necessity and the rate of the increase shall be submitted to the electors of the district, and the tax increase shall take effect only if approved by a majority of the electors voting thereon in an election held for that purpose.’
“The primary function of the Orleans Levee Board is the protection of the residents of New Orleans by constructing and maintaining levees, levee drainage, flood and hurricane protection. To this end, the Board is constitutionally permitted to issue bonds without voter approval, and pledge their taxes.
“The authority to construct and operate a marina is a secondary function of the Orleans Levee Board, authorized by the Louisiana Legislature. The ‘any other purpose related to its authorized powers’, does not include marinas. This secondary purpose, being recreational in nature, does not allow the Board, as their authority for a bond issue, to use Sections 39 and 40 of Article VI of the Louisiana Constitution.
“Therefore, the Board must look to Part II, Financing of Local Governments, Sections 26 through 37, for the authority to issue these bonds.
“Article VI, Section 37 of Part II, entitled, ‘Revenue-Producing Property’, reads as follows:
‘(A) Authorization. The legislature by law may authorize political subdivisions to issue bonds or other debt obligations to construct, acquire, extend, or improve any revenue-producing public utility or work of public improvement. The bonds or other debt obligations may be secured by mortgage on the lands, buildings, machinery, and equipment or by the pledge of the income and revenues of the public utility or work of public improvement. They shall not be a charge upon the other income and revenues of the political subdivision.
‘(B) Exception. This Section shall not apply to a school board.’ (Emphasis ours).
“The bonds proposed in this case, although silent in the pleadings, are a combination revenue bonds and General Obligation Bonds. General Obligation Bonds are defined in Article VI, Section 44(6) of the 1974 Constitution as follows:
‘ “General obligation bonds” means those bonds, the principal and interest of which are secured by and payable from ad valorem taxes levied without limitation as to rate or amount.’
“The Constitution clearly provides that General Obligation Bonds may be issued only after majority voter approval.
“‘(A) Authorization. Subject to approval by the State Bond Commission or its successor, general obligation bonds may be issued only after authorization by a majority of the electors voting on the proposition at an election in the political subdivision issuing the bonds. * * *’ [Article VI, Section 33.]
“The Louisiana Constitution clearly intended electoral approval of General Obligation Bonds by any political subdivision because payment is through the ad valorem taxes levied against its citizens. Since the citizens have not consented by vote, the Board does not have the legal authority under this section of the Constitution to issue this type of bond.
“Even if the Board had authority in the Constitution, to issue these bonds, their method of proposed repayment violates the *506 Louisiana Constitution. The Board’s formula for repayment is as follows:
These bonds are to be secured solely from the pledge of the following revenues:
a. Revenues of the proposed Marina;
b. Proceeds of the tax authorized by Section 39, Article 6 of the Constitution of Louisiana of 1974 as increased by Section 23, Article 7 of said Constitution and as implemented by Acts of the Louisiana Legislature Number 617 of 1977 and 614 of 1978, to the extent available after payment of all prior issued bonds also secured by said tax.
“Article VI, Section 37 of the Constitution, and Title 38:1235.3(A), clearly limit what may be pledged as security for the payment of the bonds.
“Article VI, Section 37, states in pertinent part:
‘ * * * The bonds or other debt obligations may be secured by mortgage on the lands, buildings, machinery, and equipment or by the pledge of the income and revenues of the public utility or work of public improvement. They shall not be a charge upon the other income and revenues of the political subdivision.’ (Emphasis ours)
“This provision would allow the Board to issue Bonds for any ‘revenue producing public utility or work of public improvement’ subject to the restrictions in the last sentence.
“The Louisiana Supreme Court in Bd. of Comm, of La. (LAMPCO) v. All Taxpayers, 360 So.2d 863 (La.1978) interpreted this Constitutional provision. In LAMPCO, supra, the Louisiana Supreme Court reversed a Court of Appeal decision which held that the particular bonds issued did not comply with the authorizing statute and were in contravention of Section 37(A). In reversing, the Supreme Court held that the revenue bonds were not a charge upon the other income and revenues of the political subdivisions, but were factually payable solely from the revenues derived from the operation of the public project, and thus were clearly in accordance with Article VI Section 37(A). The apparent fear of the Appellate Court was that the bonded indebtedness would create a binding obligation upon the cities involved which could be enforced against a member city’s entire revenues and assets, and this would clearly have violated the provisions of Section 37(A). The Supreme Court denied this result, stating that Section 37(A) ‘specifically provides that the bonds may be secured “by the income and revenues of the public utility” ’ and that the limitation in Section 37(A), ‘ “shall not be a charge upon the other income and revenues of the political sub-division” ’ * * * quite obviously means that the bonds shall not be a charge upon the income and revenues of the political subdivision other than utility revenues * * *’ (Emphasis in original).
“The bonds here would result in a binding obligation of the Levee Board. To pledge revenues or taxes not derived from the operation of the project would result in a ‘charge upon other income and revenues of the political subdivision’ and a clear violation of Article VI, Section 37 of the 1974 Louisiana Constitution. The section clearly prohibits a revenue bond being secured by any pledge of other income of the Levee Board.
“Furthermore, the Board concedes that this limitation applies to legislatively authorized bonds. As stated previously, the Board’s authority to issue bonds, if any, is legislative and, therefore, this restriction applies and the bonds are prohibited..
“In 1975 the Legislature granted specific authority and limitations to the Orleans Levee District in R.S. 38:1235.1 et seq. The ‘funds made available to them for such purpose’, are clearly limited not only by the Constitutional provision but also by R.S. 38:1235.3, which states:
‘A. In order to carry out the objects and purposes of this Part and to enable the board to finance and carry on the work * * * herein authorized or otherwise authorized by law, the board may issue * * * bonds * * * to be payable at such times and at such place or places, and to be issued under all such terms and *507 conditions, not inconsistent herewith, as the board determines to secure such bonds * * * the board may mortgage and pledge:
(1) any and all lands reclaimed or to be reclaimed, or otherwise acquired by the board as part of the development, except such part of such land as is required by the provisions hereof to be reserved and dedicated for public parks, parkways, boulevards, playgrounds and/or places of amusement, and/or beach purposes, together with all buildings and improvements made or constructed or to be made or constructed thereon, and all rights, ways, privileges, servitudes, or appurtenances thereunto belonging or in anywise appertaining, and
(2) cash, notes and/or other evidences of indebtedness received or to be received by the board in consideration for the sale or sales of any lands, lots, and improvements forming part of the development; and
(3) any lease or leases, and the rents, incomes, and other advantages arising out of any lease or leases made or granted by the board in connection with the development; and
(4) generally, any and all rights of the board in and to any lands, property, incomes, revenues, claims, and other choses in action, forming part of and/or arising out of the development.’ (Emphasis ours)
“The clear intent of both the Constitutional provision and the statute being that the bonds must be essentially self-sustaining. This leads to the conclusion that ad valorem taxes cannot be pledged to secure payment of these bonds as they do not arise out of the development being financed.
“R.S. 38:1235.3 and Constitutional Article VI, Section 37, authorises the issuance of bonds to finance these projects but limits the funding of the bonds to revenues and income arising out of the particular development. R.S. 38:1235.3(A) also clearly places another restriction on the bonded indebtedness: the amount of the bonds is limited to ‘the sum of $15,000,000 in principal amount at any one time outstanding * * *.’ And again, the statute states in subsection D:
‘ * * * Anything herein contained to the contrary notwithstanding, the aggregate principal amount of all bonds, notes, and certificates of indebtedness issued hereunder at any time outstanding, together with the total maximum liability, whether or not due then unpaid on all contracts for any work and/or material in connection with the project herein authorized, shall never exceed the sum of fifteen million dollars and any contract made or any bond, note, or certificate of indebtedness issued in violation of this provision shall be null and void.’ (Emphasis ours)
“The statute is clearly applicable to the Orleans Levee district and unequivocably restricts the amount of bonds issued under this part to fifteen million dollars in aggregate amount at any one time outstanding. The request to exceed the authorized legal limit renders this proposal invalid.
“Therefore, the Board is permitted by the Legislature to issue revenue producing bonds which must be self-sustaining by the project. Becuse the proposed bonds are not self-sustaining, they violate the Legislative authority granted to the Board.
“The State of Louisiana claims the Board does not own the water bottoms where the marina is to be constructed. The Louisiana Supreme Court in their interpretation of R.S. 38:1235.2, has granted to the Levee Board, with certain restrictions, the right of use over the navigable water bottoms in this case. Arnold v. The Board of Levee Commissioners of the Orleans Levee District, 366 So.2d 1321 (La.Sup.Ct. 1978).
“Finally, the Levee Board has proposed to insure the bond issue for a AAA rating and privately place this insurance policy.
“R.S. 38:1235.1(1) states:
‘The work of reclamation, construction, and improvement herein and heretofore authorized and provided for shall be accomplished by letting out contracts therefor from time to time in accordance with law at the time of the letting of the contracts.’
*508 “The Public Bid Law, R.S. 38:2212 requires:
‘A. (1) All public work exceeding the sum of ten thousand dollars including both labor and materials and all purchases of materials or supplies exceeding the sum of two thousand five hundred dollars to be paid out of public funds, to be done by a public entity shall be advertised and let by contract to the lowest responsible bidder * * *’
“Unquestionably, the letting of this insurance contract without public bidding violates the public bid laws and is not a permissible function of the Levee Board.
“At trial, the Board offered to stipulate that the insurance contract would conform to the Public Bid Law. That offer comes too late in order to cure this defect.
“In matters of this nature, a political subdivision must comply with the strict letter and spirit of our laws prior to Court approval.
“Accordingly, the Board of Commissioners of the Orleans Levee Board does not have the authority to issue $31,080,000.00 of Marina Bonds, Series 1980 A.”
For the reasons assigned the judgment of the trial court is affirmed.

AFFIRMED.